## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JAVONN E. CLANCY, | ) | |
| | ) | |
| Petitioner, | ) | Civil Action No. 2:19-cv-673 |
| | ) | |
| v. | ) | |
| | ) | Magistrate Judge Patricia L. Dodge |
| TAMMY FERGUSON and | ) | |
| DISTRICT ATTORNEY OF | ) | |
| BEAVER COUNTY, | ) | |
| | ) | |
| Respondents. | ) | |

## MEMORANDUM

Pending before the Court[1] is the counseled Petition for a Writ of Habeas Corpus (ECF 1) filed by Javonn E. Clancy ("Petitioner") under 28 U.S.C. § 2254. He challenges the judgment of sentence imposed on him by the Court of Common Pleas of Beaver County in 2013 on his conviction of first-degree murder. Also pending before the Court is Petitioner's Motion to Amend to add a claim for relief. (ECF 54). For the reasons below, the Court will deny the Petition, deny the Motion to Amend and also deny a certificate of appealability.

## I.     Relevant Background

On July 30, 2012, Petitioner shot and killed Marquay Lavar Riggins.[2] The Commonwealth charged him with criminal homicide and his jury trial was held in April 2013. Attorney Steven Valsamidis ("trial counsel") represented Petitioner at trial.

The trial court summarized the evidence introduced at Petitioner's trial as follows:

[O]n July 30, 2012 at approximately 12:30 p.m., officers of the Aliquippa Police Department were dispatched by the Beaver County 911 Center to the 300

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c)(1), the parties voluntarily consented to have a United States Magistrate Judge conduct proceedings in this case, including entry of a final judgment.

[2] Petitioner was 18 years and 9 months old at the time of the shooting.

1

block of Linmar Terrace in Aliquippa based on a report of a shooting. Upon arrival, the officers found Marquay Lavar Riggins lying on the street in front of 342 Linmar Terrace. The officers observed that Riggins had been shot numerous times in the torso and was unresponsive. Riggins was transported by Medic Rescue Ambulance Service to Heritage Valley Medical Center Beaver, where he was pronounced dead at 1:19 p.m.

 During their investigation of this incident, officers spoke with Dyquane Norman, a half-brother of Riggins's who was present at the scene when the shooting took place. Norman told the officers that, before the shooting, Riggins and [Petitioner] were having an argument that eventually led to [Petitioner] punching Riggins in the jaw. According to Norman, Riggins slammed [Petitioner] to the ground and began beating up [Petitioner]. Norman and another individual then pulled Riggins off of [Petitioner]. As [Petitioner] and Riggins backed away from each other, [Petitioner] pulled a black revolver out of his shorts and fired it at Riggins. Norman told the officers that he witnessed Riggins run away, grab his torso, and fall to the street near 342 Linmar Terrace….

  - - -

 Evidence and testimony presented during trial revealed that, shortly before noon on July 30, 2012, [Petitioner] and Dyquane Norman as well as several other witnesses to this incident were present at the Linmar Terrace community center to take advantage of a free lunch program being offered there that day. N.T., ,4/10/13, at 87-88. Upon leaving the community center, [Petitioner], Norman, and several other individuals walked to the 300 block of Linmar Terrace to relax. *Id.* at 88. Approximately 15 to 20 minutes later, Riggins arrived at Linmar Terrace in a white Chevrolet Impala driven by Caleb Stokes. *Id.* at 88; N.T., 4/9/13, at 30-31. Riggins approached Norman with the intention of discussing and settling a dispute involving an alleged robbery of Riggins's cousin by Norman's and [Petitioner's] friend, Damontae Williams. N.T., 4/9/13, at 30; N.T., 4/10/13, at 89.

 While they were resolving their dispute, [Petitioner], who was dressed in black clothing, approached Riggins and Norman, cut between them, and began to insult Riggins. N.T., 4/9/13, at 32; N.T., 4/10/13, at 61, 97-98, 101. According to Norman, [Petitioner's] dislike for Riggins was a result of the alleged robbery of Riggins's cousin by [Petitioner's] friend, Damontae Williams. N.T. 4/10/13, at 101. Riggins responded to [Petitioner's] insults by approaching him and asking him what the problem was. *Id.* At that point, [Petitioner] punched Riggins, and Riggins knocked [Petitioner] to the ground and began hitting him. *Id.* at 25, 101-02. After grappling with [Petitioner] on the ground for several seconds, Riggins was pulled off of [Petitioner] by Norman, Devay Owens, and Tyquale Owens. *Id.* at 102-03; N.T., 4/19/13, at 126. Once [Petitioner] and Riggings were separated, [Petitioner] pulled out a gun from his clothing and fired multiple shots at Riggins. N.T., 4/10/13, at 17-18, 63, 104-106. Riggins attempted to run from [Petitioner] but was shot three times in the back. *Id.* at 58, 106; N.T., 4/9/13, at 37, 92; N.T., 4/10/13, at 106, 152. After fleeing Linmar Terrace, [Petitioner] was seen running into a nearby wooded area and in downtown Aliquippa. N.T., 4/9/13, at 51; N.T., 4/10/13, at 161. Once Riggins collapsed, Norman and Devay Owens called 911, and the fire department and medic rescue arrived to render aid to Riggins. N.T., 4/9/13, at 130; N.T.,

2

4/10/13, at 130; N.T., 4/10/13, at 118, 201-02. Ultimately, however, Riggins died as a result of the gunshot wounds. N.T., 4/11/13, at 69, 74.

On that same date of July 30, 2012, Detective Sergeant Steve Roberts of Aliquippa Police Department issued a "be on the lookout" alert for [Petitioner] and obtained a warrant for [his] arrest. N.T., 4/11/13, at 25. Despite attempts to secure [Petitioner's] arrest, [he] continued to avoid apprehension until September 4, 2012, when [he] turned himself in to authorities. *Id.* at 29-30. Between the date of the shooting and the date [Petitioner] surrendered to law enforcement, [Petitioner] remained in contact with Norman through Facebook. *Id.* at 31. During this time, [Petitioner] utilized the Facebook username of "Snitch-Free Jay" and made several comments to Norman regarding the shooting of Riggins. *Id.* Norman surmised that the username "Snitch-Free Jay" was [Petitioner's] way of indicating that he is not a "snitch" or, in other words, that he is not someone who talks to the police. N.T., 4/10/13, at 121-22.

.... Multiple eyewitnesses, including Norman, Tyquale Owens, and Tynecia Reddick, testified that they observed a small black firearm or something resembling a firearm in [Petitioner's] possession on [the day of the shooting]. N.T., 4/9/13, at 104; N.T., 4/10/13, at 80, 105.... Multiple eyewitnesses testified that [Petitioner] verbally engaged and struck Riggins with little to no provocation, further demonstrating a plan to attack Riggins. N.T., 4/10/13, at 25, 101. Multiple eyewitnesses also testified that, following the fight, [Petitioner] pulled a gun from his clothing and fired multiple shots at Riggins. *Id.* at 17-18, 56, 63, 104-106. Three of the shots [Petitioner] fired struck Riggins in the back and caused three exit wounds in the chest area. N.T., 4/11/13, at 59-60. One of the bullets traveled through the aorta and caused the blood loss that forensic pathologist Dr. James Smith deemed the cause of Riggins's death. *Id.* at 62.... Furthermore, testimony of several witnesses, including [Petitioner], indicates that [he] fled the scene of the crime and concealed himself for more than a month from police who were searching for him. N.T., 4/10/13, at 152; N.T., 4/11/13, at 29-30, 127, 131-32, 158.... Finally, during the testimony of many of the Commonwealth witnesses, the Commonwealth displayed and asked questions about a Linmar surveillance video depicting, in part, the events of July 30, 2012. Although the fight and the shooting were out of the view of the camera, the surveillance video corroborated much of the Commonwealth witnesses' testimony, including [Petitioner's] flight.

- - -

In his defense, [Petitioner] testified on his own behalf and presented the testimony of Payton Riggins, the uncle of the victim in this matter. Payton Riggins (hereinafter, "Payton") testified that he spoke with Norman on July 30, 2012 after the shooting. N.T., 4/11/13, at 93-94. Payton indicated that, during their conversation, Norman recounted the shooting and the events surrounding it. *Id.* at 95-98. Payton also stated that, after hearing what happened, he asked Norman why Norman did not shoot the man who shot his brother, to which Norman responded that he dropped his gun when he saw his brother collapse. *Id.* at 97-98. During cross-examination, however, Payton admitted that he did not mention in his written statement that Norman had a gun at the time of the shooting. *Id.* at 100. He also admitted that he only told police of this information on March 22, 2013. *Id.* at 99.

[Petitioner] testified that he was not sure whether Norman had a gun on him at the time of the shooting. *Id.* at 132. No other witness testified that Norman had a gun, including Norman and Tyquale Owens, who testified that [Petitioner] was the only person with a firearm at the shooting. N.T., 4/9/13, at 117; N.T., 4/10/13, at 114.

During his testimony, [Petitioner] provided his account of the events of July 30, 2012. [Petitioner] testified that he did not remember how his verbal altercation with Riggins began. N.T., 4/11/13, at 116-17. Despite his lack of recollection, [Petitioner] testified that, during their argument, Riggins had his hand under his shirt as he approached [Petitioner]. *Id.* at 117-18. [Petitioner] claimed that he thought Riggins had a gun because Riggins was a dope dealer. *Id.* at 118. [Petitioner] further testified that eventually he and Riggins were shoulder to shoulder and that [Petitioner] punched Riggins with his left hand. *Id.* at 120. According to [Petitioner], Riggins then grabbed [Petitioner], bit him, knocked him to the ground, fell on top of him, and briefly wrestled with him on the ground. *Id.* at 120-22. The fight was then broken up by Devay Owens and Shawn Humphries, who held Riggins back as [Petitioner] attempted to return to his feet. *Id.* at 122-23. As [Petitioner] stood up, Riggins punched [Petitioner] twice in the face, causing [Petitioner's] face to swell. *Id.* at 123-24. [Petitioner] testified that, as a result of the punches, "my anger took over me…I just pulled the gun out…I heard the one bang, and then after that I just heard the click." *Id.* at 125. [Petitioner] further indicated that he was not aiming and that he did not intend to shoot Riggins. *Id.* at 126, 133. [Petitioner] testified that, after firing the shots, he panicked, dropped his gun, and ran from Linmar Terrace. *Id.* at 127. In adopting this version of the events of July 30, 2012, [Petitioner] argued that his actions constituted voluntary manslaughter or, at worst, third-degree murder. N.T., 4/12/13, at 32-33.

Throughout the trial, the Commonwealth raised several weaknesses in [Petitioner's] theory. For example, [Petitioner] argued that he indiscriminately fired his gun out of anger without aiming, but the Commonwealth pointed out that [he] was able to shoot his allegedly intended target in the back three times out of approximately six shots without shooting any of the bystanders. N.T., 4/11/13, at 147. The Commonwealth argued that [Petitioner's] ability to do so indicated that [Petitioner] aimed at and intended to shoot Riggins. [Petitioner] also suggested that he did not remember firing after the first shot, but the Commonwealth noted that he dropped his gun before fleeing. *Id.* at 127, 136. [Petitioner] also emphasized in his argument that some of the Commonwealth witnesses, such as Devay Owens, were present when the shooting occurred but were unable to state that [Petitioner] shot Riggins. N.T., 4/9/13, at 130. Although [Petitioner] is correct that some of the witnesses did not identify [him] as the person who killed Riggins, several eyewitnesses did identify [him] as the shooter, and no eyewitnesses indicated that [he] was not the shooter. N.T., 4/10/13, at 17-18, 56-63, 104-106. In addition, several witnesses indicated that identifying the perpetrator of such crimes to law enforcement is a practice that is disfavored and can be dangerous for someone living in Linmar Terrace. N.T., 4/9/13, at 113; N.T., 4/10/13, at 121. [Petitioner] also testified that he believed Riggins had a gun under his shirt. N.T., 4/11/13, at 120. Despite this belief, however, [Petitioner] chose not to defend himself with the firearm that he possessed but still decided to escalate the argument by punching

4

Riggins. [Petitioner] also argued that, because the surveillance video indicated that the fight and subsequent shooting occurred over the course of only twelve seconds, there was insufficient time to formulate the requisite intent to kill. In response, the Commonwealth cited the principle…that "the design to kill can be formulated in a fraction of a second." [*Commonwealth v. Jordan*, 65 A.3d 318, 323 (Pa. 2013)].

In addition to highlighting the weaknesses in [Petitioner's] theory, the Commonwealth presented multiple eyewitnesses who supported its theory that [Petitioner] intended to and did shoot and kill Riggins. Even defense witness Payton Riggins testified that, during his conversation with Norman on July 30, 2012, Norman gave an account of the shooting that was consistent with Norman's trial testimony, apart from the detail regarding Norman's possession of a firearm. N.T., 4/11/13, at 96-97. Furthermore, the surveillance video corroborated much of the testimony of these Commonwealth and defense witnesses.

(*Commonwealth v. Clancy*, No. CP-04-CR-1902-2012, slip op. at 1-2, 4-7, 10-12 (C.P. Beaver Cnty. Aug. 28, 2013) (available on Westlaw) (some bracketed text added by the trial court)).

For the homicide count, the trial court charged the jury on the crimes of first-degree murder, third-degree murder and voluntary manslaughter. The jury convicted Petitioner of first-degree murder and the trial court sentenced him to the mandatory term of life imprisonment.[3]

In his post-sentence motion, Petitioner argued that the Commonwealth introduced insufficient evidence to support the jury's verdict, and also that the jury's verdict was against the weight of the evidence. After the trial court denied these claims (*id.* at 1-13), Petitioner, through counsel, filed a direct appeal with the Superior Court of Pennsylvania raising these same claims. The Superior Court affirmed the Petitioner's judgment of sentence in *Commonwealth v. Clancy*, No. 1594 WDA 2013, 2014 WL 10803153 (Pa. Super. Ct. Aug. 29, 2014). The Supreme Court of Pennsylvania denied a petition for allowance of appeal.

Petitioner then filed pro se petition for collateral relief under Pennsylvania's Post Conviction Relief Act ("PCRA"), 42 Pa. Cons. Stat. § 9541 *et seq.* The trial court, now the PCRA court, appointed Attorney Mitchell P. Shahen ("PCRA counsel") to represent Petitioner. A

---

[3] The jury also convicted Petitioner of the crime of carrying a firearm without a license. Petitioner is not challenging the validity of that conviction in this habeas proceeding.

counseled amended PCRA petition was then filed asserting that trial counsel was ineffective because he failed to object to: (1) various statements made by the prosecutor during cross-examination and closing argument; and (2) the admission of evidence about Petitioner's Facebook profile name. (*See* ECF 1 at 5.)

Following an evidentiary hearing at which trial counsel testified, the PCRA court denied the amended PCRA petition. The Superior Court affirmed the PCRA court's order in *Commonwealth v. Clancy*, No. 1037 WDA 2016, 2017 WL 696836 (Pa. Super. Ct. Feb. 22, 2017). The Supreme Court of Pennsylvania, which had granted a petition for allowance of appeal on Petitioner's claim that trial counsel was ineffective for failing to object to purportedly inflammatory statements made by the prosecutor during closing arguments, later affirmed the Superior Court's decision that the claim lacked arguable merit. *Commonwealth v. Clancy*, 192 A.3d 44 (Pa. 2018).

Petitioner, now represented by his current counsel, then filed in this Court his Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254. (ECF 1.) The Petition contains a basic summary of the information contained in Petitioner's 2013 presentence report and an investigation conducted by a mitigation specialist, retained by Petitioner's current counsel, who had interviewed Petitioner's family members and reviewed his institutional records for the purpose of this proceeding. (ECF 1 at pp. 20-31.) Petitioner argues that this information, most of which was available at the time of his trial, shows that he has a history of trauma, drug abuse, and family dysfunction. Trial counsel should have obtained this information, Petitioner contends, and then should have had Petitioner evaluated by a mental health expert to support a diminished capacity defense to the charge of first-degree murder. Petitioner raises a single claim in the Petition ("Claim

I"): that trial counsel was ineffective for failing to present a diminished capacity defense. (*Id.* at 31.)

When Petitioner commenced this habeas action, he explained that it was his intent to be evaluated by a forensic mental health evaluator in order to support Claim I. He requested that the Court permit him to file his brief in support of the Petition after that evaluation was conducted. The Court granted his request. (*See* ECF 2, 5, 7.)

Following delays because of the impact of COVID-19, Petitioner filed his brief in support of the Petition. (ECF 39.) Attached to his brief is a report by Gillian Blair, Ph.D., dated August 23, 2021. (ECF 39-1.) In her report, Dr. Blair explains that she evaluated Petitioner in person on June 3, 2021 at SCI Chester. Dr. Blair also conducted telephone interviews of Petitioner's mother, father, maternal aunt and two other acquaintances and reviewed his medical, prison, and school records as well as a memoranda of interviews carried out by the mitigation specialist. She states that although Petitioner was "not formally diagnosed with any mental illness prior to his arrest in 2012, this appears to reflect parental neglect rather than an absence of disorder." (ECF 39-1 at 16.) Dr. Blair explains that Petitioner has been diagnosed with Bipolar disorder and opines that, if he had been evaluated prior to his trial, he likely would have been diagnosed with Post-traumatic stress disorder ("PTSD") resulting from the cumulative traumas he experienced.[4] (*Id.*) Given the findings of her evaluation of Petitioner, it is Dr. Blair's opinion that he did not act with specific intent to kill Riggins because "he was not able to formulate such intent based on then undiagnosed mental impairments." *Id.*

---

[4] Dr. Blair reported that "[Petitioner's] endorsed test items that reflected significant trauma that included having been threatened with sexual assault as a young child that put him in fear of being killed/seriously harmed, being shot at, witnessing several instances of others being killed and seriously hurt, physical abuse throughout his childhood, and a serious assault in 2014." (ECF 39-1 at p. 14.)

Respondents have filed an Answer (ECF 47) opposing Petitioner's request for habeas relief and Petitioner has filed his Reply (ECF 53). Petitioner also has filed a Motion to Amend (ECF 54) in which he seeks leave to raise another claim: that trial counsel was ineffective for failing to investigate Petitioner's trauma history and resulting mental health impairments to support the voluntary manslaughter/heat of passion defense that was presented at trial. Petitioner relies on Dr. Blair's report to support this proposed claim as well. Respondents have filed a brief opposing Petitioner's Motion to Amend (ECF 57), to which Petitioner has replied (ECF 58.)

## II.    Discussion

### A.    Jurisdiction

The Court has jurisdiction under 28 U.S.C. § 2254, the federal habeas statute applicable to prisoners in custody pursuant to a state-court judgment. It permits a federal court to grant a state prisoner a writ of habeas corpus "on the ground that he or she is in custody in violation of the Constitution…of the United States." 28 U.S.C. § 2254(a). Errors of state law are not cognizable. *Id.*; *see, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). It is Petitioner's burden to prove that he is entitled to the writ. *See, e.g.*, *Vickers v. Sup't Graterford SCI* , 858 F.3d 841, 848-49 (3d Cir. 2017).

### B.    Discussion

Claim I

In Claim I, Petitioner contends that trial counsel provided him with ineffective assistance, in violation of his rights under the Sixth Amendment, for failing to investigate and present an available diminished capacity defense.[5] Diminished capacity is an extremely limited defense under

---

[5]  Ineffective assistance of counsel claims are governed by the familiar standard set forth by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail on a claim of *Footnote continue on next page…*

Pennsylvania law. *See, e.g.*, *Saranchak v. Beard*, 616 F.3d 292, 308 (3d Cir. 2010); *Commonwealth v. Taylor*, 876 A.2d 916, 926 (Pa. 2005); *Commonwealth v. Legg*, 711 A.2d 430, 444 (Pa. 1998); *Commonwealth v. Zettlemoyer*, 454 A.2d 937, 943 (Pa. 1982); *Commonwealth v. Weinstein*, 451 A.2d 1344, 1347 (Pa. 1982). A defendant invoking the diminished capacity defense concedes general criminal liability but contends that the prosecution cannot prove specific intent, an essential element of first-degree murder. *See, e.g.*, *Weinstein*, 451 A.2d at 1347. "[I]f established, the defense operates only to negate premeditation and if successful, reduces a first-degree murder charge to third-degree murder." *Commonwealth v. Avery*, 277 A.3d 1132, 2022 WL 1073821, *6 (Pa. Super. Ct. Apr. 11, 2022).

Under Pennsylvania law, a diminished capacity defense "requires a defendant to establish through 'extensive psychiatric testimony [that he] suffered from one or more mental disorders which prevented him from formulating the specific intent to kill.'" *Saranchak*, 616 F.3d at 308 (quoting *Commonwealth v. Cuevas*, 832 A.2d 388, 393 (Pa. 2003) (which cited *Zettlemoyer*, 454 A.2d at 943)) (altered text added by court of appeals); *Avery*, 277 A.3d 1132, 2022 WL 1073821, at *6 ("Diminished capacity is not a justification or excuse; it is essentially a rule [of evidence] that permits the admission of expert testimony to disprove an element of first-degree murder (mens rea) and that requires the judge to comment on the expert evidence in a way that ensures that the jury will give it neither too much nor too little weight.") (internal quotations and citations omitted). To support the defense, a defendant must proffer admissible evidence that he suffered from a

---

ineffective assistance under *Strickland*, the petitioner has the burden of establishing that "counsel's representation fell below an objective standard of reasonableness." 466 U.S. at 688. *Strickland* also requires that the petitioner demonstrate that he was prejudiced by his trial counsel's alleged deficient performance. This places the burden on the petitioner to establish "that there is a reasonable probability that, but for counsel's unprofessional errors," the result of his trial "would have been different." *Id.* at 694.

mental illness that affected his cognitive functions to an extent that precluded deliberation and premeditation. *See, e.g.*, *id.*; *Commonwealth v. McCullum*, 738 A.2d 1007, 1009 (Pa. 1999).

As discussed above, Petitioner relies primarily, if not entirely, on Dr. Blair's report to support Claim I. He argues that if trial counsel had investigated readily available information about his background, trial counsel would have realized that Petitioner had a viable diminished capacity defense and would have obtained testimony from an expert such as Dr. Blair to present at trial in support of the defense.

Petitioner concedes that he procedurally defaulted Claim I because he did not litigate it in his PCRA proceeding.[6] He argues that he can overcome the default under the rule established by *Martinez v. Ryan*, 566 U.S. 1 (2012) because his PCRA counsel was himself ineffective for failing to litigate Claim I in the PCRA proceeding. In *Martinez*, the Supreme Court held that in states like Pennsylvania, where the law requires that claims of ineffective assistance of trial counsel be raised for the first time in a collateral proceeding,[7] a petitioner may overcome the default of a claim of trial counsel's ineffectiveness if the petitioner shows: (1) the defaulted claim of trial counsel's ineffectiveness is "substantial" and (2) PCRA counsel was ineffective under *Strickland v.*

---

[6] The doctrine of procedural default, like the related doctrine of exhaustion, is "grounded in concerns of comity and federalism[.]" *Coleman v. Thompson*, 501 U.S. 722, 730 (1991). As relevant here, it provides that a Pennsylvania state prisoner in a non-capital case defaults a federal habeas claim if he failed to present it to the Superior Court and he cannot do so now because the state courts would decline to address the claims on the merits because state procedural rules (such as the PCRA's one-year statute of limitations or waiver rules) bar such consideration. *See, e.g.*, *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *O'Sullivan v. Boerckel*, 526 U.S. 838, 851-56 (1999) (Stevens, J. dissenting) (describing the history of the procedural default doctrine); *Wainwright v. Sykes*, 433 U.S. 72 (1977); *Lines v. Larkins*, 208 F.3d 153, 162-69 (3d Cir. 2000).

[7] In Pennsylvania, a defendant typically may not litigate ineffective assistance of trial counsel claims on direct appeal. Such claims must be raised in a PCRA proceeding. *Commonwealth v. Grant*, 813 A.2d 726 (Pa. 2002) (abrogated in part on other grounds by *Commonwealth v. Bradley*, 261 A.3d 381 (Pa. 2021)).

*Washington*, 466 U.S. 668 (1984) for (3) failing to raise that claim in the "initial review collateral proceeding" (meaning to the PCRA court). *Martinez*, 566 U.S. at 17.

A petitioner may also avoid the default of a claim by showing that the federal habeas court's failure to consider it will result in a fundamental miscarriage of justice. *See, e.g.*, *Lines*, 208 F.3d at 160. This type of "gateway" actual innocence claim requires newly presented evidence of "actual innocence" that is "so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error[.]" *Schlup v. Delo*, 513 U.S. 298, 316 (1995); *see also McQuiggin v. Perkins*, 569 U.S. 383 (2013). Petitioner also relies on this exception to the procedural default rule.

If Petitioner establishes grounds to excuse his default, the Court must then review Claim I de novo. *See, e.g.*, *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001); *see, e.g.*, *Howard v. DelBalso*, No. 1:16-cv-78, 2017 WL 3446826, *9 n.9 (W.D. Pa. Aug. 10, 2017). But in order to carry his burden of establishing both excuse for his default and the merits of Claim I, Petitioner must introduce his new evidence into the record. That is because "[a] petitioner may not simply attach documents to [his] habeas petition and ask the district court to consider them. Rather, evidence relied upon by the petitioner that is not otherwise part of the state court record must be properly admitted into the record before the district court." *Wilcott v. Wilson*, No. 1:07-cv-299, 2010 WL 582367, *5 (W.D. Pa. Feb. 15, 2010).

Petitioner contends that he is entitled to an evidentiary hearing in order to prove he can overcome his default and also to support the merits of Claim I (as well as the new claim he proposed in his Motion to Amend). The Supreme Court's recent decision in *Shinn v. Ramirez*, 142 S. Ct. 1718 (2022), which was decided after the parties submitted the pleadings in this case,

forecloses Petitioner's argument. To understand why, a brief discussion of the relevant provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") is necessary.

In 1996, Congress made significant amendments to the federal habeas statutes with AEDPA, which "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002) (citing *Terry Williams v. Taylor*, 529 U.S. 362, 403-04 (2000)). AEDPA substantially revised the law governing federal habeas corpus. Among other things, AEDPA put into place "even more 'stringent requirements'" regarding evidentiary development than those that were in place before its enactment. *Shinn*, 142 S. Ct. at 1734 (quoting *Michael Williams v. Taylor*, 529 U.S. 420, 433 (2000)).

AEDPA, as codified at 28 U.S.C. § 2254(e)(2), provides:

> *If the applicant has failed to develop the factual basis of a claim in State court proceedings*, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that–
>
> (A)  the claim relies on–
>
> > (i)  a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> >
> > (ii)  a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B)  the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

(Emphasis added). "Under the opening clause of § 2254(e)(2), a failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner *or the prisoner's counsel*." *Michael Williams*, 529 U.S. at 432 (emphasis added); *see also Shinn*, 142 S. Ct. at 1734-35.

When § 2254(e)(2) does not prohibit a federal habeas court from holding an evidentiary hearing, it is within the district court's discretion whether to hold one under Rule 8 of the Rules Governing § 2254 Cases in the United States District Courts. *See, e.g.*, *Schriro v. Landrigan*, 550 U.S. 465, 473-75 (2007).[8]

Before *Shinn*, the rule in the Third Circuit (and in many other circuits) was that the § 2254(e)(2)'s prohibition on evidentiary hearings *did not apply to the issue of whether a petitioner could overcome the default* of a claim. *Cristin v. Brennan*, 281 F.3d 404, 413 (3d Cir. 2002).[9] Rather, the decision to hold a hearing on that issue was a discretionary one. If the federal habeas court held a hearing on whether the petitioner could overcome the default of a claim, and if the petitioner successfully showed that he could do so, the court could then consider the evidence introduced at the hearing when it issued a de novo ruling on the merits of the underlying habeas claim. *See, e.g.*, *Shinn*, 142 S. Ct. at 1729-30; *Gelsinger v. Sup't of Fayette SCI*, No. 21-2844, 2022

---

[8] In deciding whether to exercise that discretion, the federal habeas court "must consider whether such a hearing could enable the applicant to prove…factual allegations [that] would entitle [him] to federal habeas relief." *Shinn*, 142 S. Ct. at 1739 (quoting *Landrigan*, 550 U.S. at 474). "'This approach makes eminent sense,'" *Shinn* explained, "for if 'district courts held evidentiary hearings without first asking whether the evidence the petitioner seeks to present would satisfy AEDPA's demanding standards, they would needlessly prolong federal habeas proceedings.'" *Id.* (quoting *Cullen v. Pinholster*, 563 U.S. 170, 208-09 (2011) (Sotomayor, J., dissenting).

[9] In *Cristin*, the Court of Appeals concluded "that the plaining meaning of § 2254(e)(2)'s introductory language does not preclude federal hearings on excuses for procedural default at the state level." 281 F.3d at 413. The Court of Appeals' conclusion was based on two principal reasons. First, that a hearing used to support an excuse for procedural default is not a hearing on "a claim" under AEDPA because it is not a claim for relief on the merits. *Id.* at 417-18. Second, that a state prisoner "cannot be faulted…for not having previously presented the facts underlying arguments that would have been, on the whole, irrelevant or premature before state courts." *Id.* at 417. As explained below, *Shinn* "suggests that [t]here is good reasons to doubt' [the Court of Appeals'] reading of the word 'claim' in *Cristin*, [but] it [did] not abrogate [*Cristin's*] holding that, generally, AEDPA's text does not forbid federal courts from developing the facts needed to excuse a procedural default." *Williams v. Sup't Mahanoy SCI*, 45 F.4th 713, 723 (3d Cir. 2022). However, *Shinn* set significant limits on *Cristin's* reach, which are discussed below.

13

WL 3666228, *2 (3d Cir. Aug. 25, 2022). That is precisely what Petitioner argues the Court should do in this case so that the Court can consider his new evidence.

*Shinn* clarified that the Court cannot proceed the way Petitioner suggests. The Supreme Court reiterated in *Shinn* that "state postconviction counsel's ineffective assistance in developing the state-court record is attributed to the prisoner." 142 S. Ct. at 1734. Thus, when, as is the case here, the petitioner faults state post-conviction counsel for failing to develop evidence to support a defaulted habeas claim, the federal habeas court is prohibited from holding an evidentiary hearing or otherwise expanding the state court record to introduce evidence to support that claim unless the petitioner *has satisfied one of 2254(e)(2)'s two narrow exceptions to AEDPA's general bar on evidentiary hearings. Id.* at 1735. *See also Williams v. Sup't Mahanoy SCI*, 45 F.4th 713, 724 (3d Cir. 2022) (AEDPA's prohibition is not limited to formal evidentiary hearings and applies whenever the petitioner wants to expand the record beyond that developed in state court) (citing *Shinn*, 142 S. Ct. at 1738 and *Holland v. Jackson*, 542 U.S. 649, 653 (2004)).

The Supreme Court also held in *Shinn* that if a federal habeas court holds a hearing on whether a petitioner can overcome the default of a claim, *it may not consider evidence introduced at that hearing in evaluating the merits of the underlying habeas claim unless the petitioner has satisfied one of 2254(e)(2)'s two narrow exceptions to AEDPA's general bar on evidentiary hearings*. 142 S. Ct. at 1733-39; *id.* at 1739 ("when a federal habeas court convenes an evidentiary hearing *for any purpose*, or otherwise admits or reviews new evidence *for any purpose*, it may not consider that evidence on the merits" when evaluating the default habeas claim "unless the exceptions in § 2254(e)(2) are satisfied.") (emphasis added). Accordingly, a federal habeas court can no longer "'end-run' AEDPA by holding hearings on an excuse for procedural default, and

then use the expanded federal record to decide the merits of a habeas claim." *Williams*, 45 F.4th at 723 (quoting *Shinn*, 142 S. Ct. at 1738).

Importantly, in light of *Shinn*, the Court of Appeals in *Williams v. Superintendent Mahanoy SCI*, 45 F.4th 713 (3d Cir. 2022) has instructed that now, before holding a hearing on whether a petitioner can overcome a default of a claim, a federal habeas court must first decide whether the underlying defaulted habeas claim "succeeds considering *only the state court record*." *Id.* at 724 (emphasis added). If the court concludes that the underlying claim is not supported by the state court record, it "should deny relief without more." *Id.* That is, if the state court record alone does not allow the petitioner to succeed on the habeas claim, the court must skip a hearing on whether the petitioner can overcome the default "altogether and deny habeas relief" on the underlying habeas claim. *Id.* at 723-24; *see also id.* at 720 (explaining that the court "need not dwell" on the issue of whether the petitioner can overcome his default if the petitioner cannot show that his trial counsel was ineffective when considering only the facts developed in state court.)[10]

---

[10] The Court of Appeals explained:

> While *Shinn* suggests that "[t]here are good reasons to doubt" our reading of the word "claim" in *Cristin*, it does not abrogate our holding that, generally, AEDPA's text does not forbid federal courts from developing the facts needed to excuse a procedural default. *Id.* at 1738. But *Shinn* does set limits on *Cristin's* reach. *Shinn* makes clear that, when a prisoner is at fault for failing to develop the record needed to support a constitutional claim on the merits in state court and cannot satisfy section 2254(e)(2)'s exceptions, federal courts may not consider evidence first gathered during an excuse hearing allowed by *Cristin* to decide the constitutional claim on the merits. *Id.* at 1738. *To avoid prolonging federal habeas proceedings, Shinn also instructs that in these cases, federal courts must skip hearings altogether and deny habeas relief unless the prisoner prevails on the merits considering only the state court record. Id.* at 1739.

*Id.* at 723-24 (emphasis added).

Here, Petitioner does not contend that evidence in the state court record, standing alone, supports Claim I. Rather, Claim I is premised almost on entirely on evidence outside the state court record and primarily on Dr. Blair's report. Petitioner does not argue that he can satisfy either of the two limited scenarios set forth in § 2254(e)(2) such that the Court could consider his new evidence when evaluating the merits of Claim I. Nor can he, since he is not relying on (1) a "new" and "previously unavailable" "rule of constitutional law" made retroactively applicable by this Court, and (2) neither Dr. Blair's report nor any of the other relevant information summarized in the Petition qualifies as "a factual predicate that could not have been previously discovered through the exercise of due diligence." 28 U.S.C. § 2254(e)(2)(A)(i)(ii).

Because Petitioner has not satisfied either of AEDPA's two limited scenarios necessary to permit the Court to conduct a hearing *on the merits* of Claim I, he cannot introduce into the record the evidence he contends supports it. Therefore, the Court need not hold a hearing *on whether he can overcome his default* since, even if the Court excused his default, it could not consider his new evidence in evaluating the merits of Claim I.

Based on the above, the Court must conclude that Petitioner has not satisfied his burden of establishing that his is entitled to relief on Claim I. He has not shown that his trial counsel was ineffective based on a closed state record. Accordingly, the Court will deny the Petition.[11]

---

[11] The Court notes that even if it could consider Petitioner's new evidence, he likely could not prevail on Claim I. Conclusory expert testimony on an ultimate fact, such as the non-existence of specific intent, is improper under Pennsylvania law if the testimony is unsupported by the expert's underlying testimony. *See, e.g., Woo v. Beard*, 2:05-cv-1105, 2006 WL 3813986, *4-6, 10-11 (W.D. Pa. Dec. 27, 2006). It is at least debatable whether Dr. Blair sufficiently explains how Petitioner's mental disorders affected his cognitive functions such that he could not form the specific intent to kill Riggins. In any event, given the strength of the Commonwealth's case that he did act with specific intent to kill, if Petitioner could have an evidentiary hearing in this habeas case he likely would have a difficult time showing he was prejudiced by trial counsel's failure to present a diminished capacity defense. *Buehl v. Vaughn*, 166 F.3d 163, 172 (3d Cir. 1999) ("It is *Footnote continue on next page…*

**Motion to Amend**

In his Motion to Amend (ECF 54), Petitioner seeks leave to amend the Petition to include the claim that trial counsel was ineffective for failing to investigate Petitioner's trauma history and resulting mental health impairments to support the voluntary manslaughter/heat of passion defense that was presented at trial. Like Claim I, this proposed claim is based on new evidence, primarily Dr. Blair's report. Petitioner concedes that, like Claim I, he procedurally defaulted this proposed claim because he did not raise it in the PCRA proceeding. He raises all of the same arguments he raised with respect to Claim I to support the contention that he can overcome the default of this proposed claim and that he is entitled to an evidentiary hearing to introduce into  the record his new evidence to support it.

The availability of the option of amending a habeas petition depends in part on the stage of the case at which a petitioner seeks to amend. In this case, Petitioner moved to amend his petition after Respondents filed their answer and, as a result, he may amend only with Respondents' consent, which he does not have, or leave of court. Fed. R. Civ. P. 15(a)(2). "The court should freely give leave when justice so requires." *Id.* Leave to amend may be denied when the court finds: (1) undue delay; (2) undue prejudice to the non-moving party; (3) bad faith or dilatory motive; or (4) futility of amendment. *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000).

---

firmly established that a court must consider the strength of the evidence in deciding whether the *Strickland* prejudice prong has been satisfied."); *Saranchak*, 616 F.3d at 309-11 (given other evidence demonstrating the petitioner's specific intent to kill, he was not prejudiced by his counsel's ineffective assistance with respect to the diminished capacity defense); *Zettlemoyer*, 923 F.2d 284, 297 (3d Cir. 1991) (same).

The futility of amendment factor is present here because Petitioner cannot introduce his new evidence to support his proposed claim for all of the same reasons the Court discussed in disposing of Claim I. Therefore, the Court will deny the Motion to Amend based on futility.

## III.   Certificate of Appealability

AEDPA codified standards governing the issuance of a certificate of appealability for appellate review of a district court's disposition of a habeas petition. It provides that "[a] certificate of appealability may issue…only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When the district court has rejected a constitutional claim on its merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Applying that standard here, jurists of reason would not find it debatable whether Petitioner's claim should be denied and also that it would be futile permit him to amend to raise his proposed claim. Thus, a certificate of appealability is denied.

## IV.   Conclusion

The Court will deny the Petition (ECF 1), deny the Motion to Amend (ECF 54), and will deny a certificate of appealability. An appropriate Order follows.

Date:  November 22, 2022                    /s/ Patricia L. Dodge
                                             PATRICIA L. DODGE
                                             United States Magistrate Judge